**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| ALLAN W. YOUNG, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE )<br>Commissioner of Social Security )<br>Administration, )<br>)<br>Defendant. ) | Case No. 09-1191 |

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal is DENIED, and the Commissioner's Motion to Affirm is GRANTED.

## BACKGROUND

The Plaintiff, Allan W. Young, applied for Supplemental Security Income and Disability Insurance Benefits on December 20, 2005, (R165-73), alleging that he was completely disabled due to his diabetes and a seizure disorder (R165-73). At the time, he was 50 years old, 5'7" tall, and 176 pounds (R190). He does not smoke, drink, or use illegal drugs (R93-94). He lives alone[1] in a mobile home in the country (R89). However, his elderly father lives next door, and he receives some financial assistance and help around his house from a woman who visits him several times a week (R92, 106-07). Mr. Young has a high school education (R196), and has previously worked as a laborer, parts packager, operating engineer, floor maintainer, and creative advertiser (R198). He stated in his disability report that he been unemployed since March, 2003

---

[1] In a medical report dated February 7, 2007, Mr. Young told his physician that his brother had been living on his property – but not in his home – for years, but that Mr. Young had recently ejected him from the property (R363).

(R191), but he testified that he performed occasional work with his brother at the horse stables of his treating physician, Dr. Reed, up until October 2005 (R89, 98, 198).

Mr. Young's initial claim was denied on March 2, 2006 on the grounds that he was not fully disabled (R122). His subsequent request for reconsideration of the claim was denied on May 17, 2006 (R129-33). He then requested a hearing by an Administrative Law Judge ("ALJ") on May 31, 2006 (R139).

The hearing before ALJ John Dodson took place on August 21, 2008 in Peoria, IL (R74). Vocational Expert ("VE") Dr. James Lanier as well as Mr. Young and his attorney, Mr. Thomas Henry, were present. Id. Mr. Young testified that on the alleged onset date, October 15, 2005, he suffered a black out seizure while performing a song at church and was hospitalized (R84-85). See also R257 (Mr. Young describes the blackout seizure as including "head turning and body stiffening" and a generalized headache afterwards); R205-07 (documentation of eyewitness accounts of his seizures, including the incident described above).

In addition to the black-out seizures, Mr. Young also testified to having mild seizures where "a glaze comes over" and he gets a "funny feeling," but does not "black out" (R84). The seizure typically lasts two to three minutes, and he knows that he is having a seizure as it happens. Id. See also R432 (neurologist notes that according to the claimant, a "mild seizure" lasts about ten seconds and is a "strange sensation in the form of a pressure sensation and his forehead sweats. He feels a little bit spacy but he does not completely lose [sic] consciousness"). During a "mild seizure" he continues what he is doing or "might sit down…and wait until it passes…just relax" (R84). After a seizure has occurred, he discusses what happened with someone, and often lays down to rest (R96).

Since the alleged onset date, Mr. Young has been treated for his epilepsy and diabetes by two physicians. Dr. James Reed, who treated him following his hospitalization through at least May 2006, noted that Mr. Young had suffered from Jacksonian tremors since he was a child (R294) and that he had an elevated blood sugar level (R293), which he diagnosed as diabetes on November 21, 2005 (R292). He also described Mr. Young as a "social outcast" with a "real odd personality" (R294). See also (R331) (opining that "most of his problems come from having a long standing personality problem, anxiety state"). Dr. Reed hoped that controlling Mr. Young's blood sugar could help with the seizures (R291), but he also placed him on Depakote to treat the seizures and Phenobarb to help with his seizures and anxiousness (R331). While Mr. Young was on his medication, Dr. Reed noted that Mr. Young was having fewer seizures and that he was looking and feeling better (R329).

Dr. Reed referred Mr. Young to neurologist Dr. Jianming Dong for an electroencephalogram ("EEG") test on November 28, 2005. It was a "normal awake and drowsy EEG without definite evidence of epileptiform abnormalities or electrographic seizure activities," although that diagnosis did not foreclose the possibility that Mr. Young had a seizure disorder or epilepsy (R257). Dr. Dong's assessment found "[t]he infrequent sporadic pattern of clinical events is not very typical for epileptic seizure disorder. . . . The patient may have undetectable diabetes and hyperlipidemia which are potential risk factors for cerebrovascular and cardiovascular events. . . . I recommend the patient to decrease caffeine intake. Excessive use of caffeine may cause agitation, anxiety attacks and shaking episodes" (R267).

From at least January, 2007, Mr. Young began seeing Dr. Kenneth Krock as his physician (R336). Mr. Young was again suffering from seizures and had not been taking any Depakote, Phenobarb or Metformin (his diabetes medication) for several months. Id. Dr. Krock classified

the seizure disorder as "questionable" or "undiagnosed" in nearly every medical report filed, but also noted that neurological exams would be necessary for a conclusive diagnosis. See, e.g., R370 ("Doesn't sound typical of any kind of seizure to me, but again I believe more history is needed and more follow up."); R392 (suggesting neurological testing since "[t]he underlying nature of the seizures has never directly been elucidated and I am not particularly clear whether or not he truly has a seizure disorder").

On Dr. Krock's referral, Mr. Young saw a second neurologist, Dr. Erhan Ergene who performed a second EEG to rule out epileptiform abnormalities (R430). The EEG, performed on July 28, 2008, was "normal" (R434). Based on Mr. Young's self-reported history, Dr. Ergene noted there were "possible complex partial seizures." Id. He recommended another EEG – which Mr. Young refused – and an MRI to test for structural causes of the seizures such as mesial temporal sclerosis. Id. The MRI, performed on August 29, 2008 did detect mesial temporal sclerosis (R435). Dr. Ergene also recommended that Mr. Young take Trileptal to control his seizures, but Mr. Young refused. Id.

Mr. Young identified in his testimony several factors that he believed caused seizures to occur. The first factor is his adult onset diabetes (R86). In testimony, he noted that he had not experienced a black out seizure while on Metformin, the drug used to treat his diabetes. Id. Failure to get enough sleep and fatigue was a second factor which allegedly triggered a seizure (R96). A third factor was heat and humidity (R87, 432). Mr. Young also testified that he had tooth problems that "seem to enhance it" and that he had "heard … from someone or read it someplace" that the psoriasis in his ears could also "promote" the seizures (R97).

When asked about his daily activities, Mr. Young testified that he typically wakes up around 11 a.m., makes breakfast and takes his prescribed medication (R87-88). He performs

occasional yard work and drives to nearby Canton, IL for groceries or to run errands several times each week (R90). Sometimes he goes to the library to pick up movies to watch at home (R93). He plays guitar and composes original music for performance at several churches in the area (R90-91). At home, he receives visits from a female friend several times a week (R92). He takes a walk about three times each week to exercise (R93). He also cleans his home and music equipment from time to time (R105).

      Mr. Young testified that he had stopped working for several reasons because of his alleged disability. First, he cited safety reasons as a primary concern (R97-98). He also spoke about pain that interfered with his ability to perform prior jobs, like baling hay and moving packages (101). His knees "hurt so bad that [he] tried to stay off them," but that being "conscious" of the problem helped alleviate the pain (R104). He stated that his shoulders and knees were "out of whack" and that he occasionally had numbness in his knees and toes, but that he had been doing isometric exercises which helped (R99, 101). He also noted that lifting too much weight, such as fifty pounds, would cause long-term pain (R99-100). Finally, he could sit for at least an hour, but had to get up and move around to get the circulation going after that (R94).

      Another factor which impeded his ability to work was that it took him longer to perform tasks. In addition to being easily worn out due to his age (R105), he testified to being very "cautious" in going about his daily activities (R103), and that he keeps a diary of his diet (R88). See also R86-87 (testifying that watching what he eats and what medication he takes is "kind of a full-time job"). When asked whether he would accept a janitorial job, Mr. Young said that he was concerned about the "rat race, the getting up and trying to fit their schedule and not keeping pace with…my own personal life…and the lifting and… you don't know the people you're

around" (R103-04).  He further explained that the work went "against [his] health" and "didn't seem to be worth it…for what small pay there was" (R105).

An assessment of Mr. Young's Physical Residual Functional Capacity ("PRFC") conducted by medical consultant Sandra Bilinsky on February 2, 2006 found that he was "alert and oriented" with normal gait and coordination and with an extremely elevated blood sugar level (R311).  Due to the alleged syncope or seizures, which was possibly related to his uncontrolled diabetes, she recommended that he "avoid unprotected hazards including climbing of ladders, rope and scaffolds and the operation of dangerous machinery (R308).

Based on Mr. Young's testimony, medical records, and the RFC assessment, the ALJ found that Mr. Young had certain limitations; namely, "he cannot climb ladders, ropes or scaffolds, he cannot kneel or crawl, he must avoid concentrated exposure to unprotected hazards such as heights and machinery, he must avoid concentrated exposure to extreme heat and cold, and he needs a stand/sit option" (R55).  Because of these limitations, Mr. Young was unable to perform a full range of light work; therefore, the ALJ posed the following hypothetical to the VE to determine what jobs, if any, Mr. Young could perform:

> Doctor, I want you to assume a person with the same age, education, and work experience as the claimant, and assume further that this person is capable of performing the full range of light work, except he's not to have any ropes, ladders, or scaffolds; he would avoid concentrated exposure to unprotected hazards such as heights and machinery; he would also have to avoid exposures to extreme heat and cold . . . and also have a sit/stand option; and there would be no kneeling or crouching, or excuse me, no kneeling or crawling.  Would such a person be able to perform this claimant's prior relevant work?  (R109-10)

Based on the hypothetical, the VE testified that Mr. Young would be able to perform his past relevant work as a graphic designer[2], and that there were several other jobs available in the regional or national economy that Mr. Young would be able to perform (R110-11).  These

---

[2] Several days after the hearing, Mr. Young notified the ALJ that he had never worked as a graphic designer (R250-51).

additional jobs were surveillance system monitor (a sedentary job with 5,400 positions); ampoule sealer in the pharmacist industry (a sedentary job with 6,500 positions); lens glass assembler (a sedentary job with 5,000 positions); and eyeglass frame polisher (a sedentary job with 5,810 positions).  Id.  The VE further asserted that the calculations for the number of positions were based in the state of Illinois, fifty percent of which would be in the Chicago area (R111).

The VE also testified that his data were taken from the "Occupational Employment Quarterly," published by the private firm "US Publishing Company" (R112-13).  The VE asserted that the data in this publication were derived from various government statistical offices, including the US Bureau of the Census, the US Bureau of Labor Statistics, the DOT, the Illinois and US Department of Labor (R112).  The VE also testified to using "occupation projections" from the Illinois Department of Employment Security and the O-NET program, which he described as a "job browser pro, skill train" that he had purchased (R112-13).

On October 9, 2008, the ALJ issued a denial of Mr. Young's claim (R57).  The ALJ first found that Mr. Young had not been engaged in substantial gainful activity ("SGA") since the alleged onset date, October 15, 2005, but that had he met the insured status requirement of the Social Security Act through 2005 (R50).  The ALJ next found – with only cursory explanation – that Mr. Young had diabetes and a seizure disorder which were "severe" and caused "significant limitation in the claimant's ability to perform basic work activities" (R50).

However, the ALJ found that Mr. Young's impairments, though severe, did not "meet or medically exceed" the listed impairments for diabetes mellitus (Listing 9.08) and convulsive or nonconvulsive epilepsy (Listings 11.02 and 11.03, respectively) found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R50).

Next, after describing in detail the claimant's testimony and various medical exhibits, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment…." (R54). The ALJ found that despite Mr. Young's complaint, he could perform some types of light work and his seizures were controlled by exercise and medication. Id. He also found that Dr. Reed's medical opinion that Mr. Young was disabled was not persuasive because it was unsupported by objective medical testing and because it was "sharply" inconsistent with other physicians' diagnoses (R55).

Based on the limitations he had identified based on the RFC, Mr. Young's testimony, and medical records, the ALJ determined that Mr. Young could not perform his past relevant work as a janitor, heavy equipment operator, hand packager, or animal caretaker (R56); however, he found that there were jobs available in the local and national economy that Mr. Young could perform based on the VE's testimony (R56-57). Therefore, Mr. Young was "not disabled" under 20 CFR 404.1520(g), and was ineligible for supplemental security income and disability insurance benefits (R57).

Mr. Young's request for a review of the ALJ's order by the Appeals Council was denied on May 8, 2009 (R1-4). He then filed a timely appeal with this Court. This Court has jurisdiction to review the ALJ's determination under 42 U.S.C. § 405(g).

## **APPLICABLE LAW**

To be entitled to supplemental income and disability insurance benefits, a plaintiff must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in

determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, App'x 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at Steps Three and Five, to a finding that the plaintiff is disabled. A negative answer at any point, other than at Step Three, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on Steps One through Four. However, once the plaintiff shows an inability to perform past work, the burden shifts to the

Commissioner to show that the claimant has the ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

## DISCUSSION

Mr. Young essentially raises three arguments for review. First, he argues that the ALJ "should have awarded disability" at Step Two of the process after finding that Mr. Young's impairments were "severe." Plaintiff's Brief 10. Second, the ALJ committed reversible error by failing to include the standard Psychiatric Review Technique Form at Step Three, when he determined that the impairment did not meet or medically exceed any listed impairment. Pl.'s Br. 10-12. Third, the ALJ committed reversible error at Step Five, when he determined that there were jobs in the national economy that Mr. Young could perform, by making his own medical judgment in place of all of Mr. Young's treating physicians and by relying on Vocational Rule 201.23 instead of vocational testimony. Pl.'s Br. 12-18.

First, the ALJ was correct to continue to Step Three of the sequential process to determine whether Mr. Young's condition met or medically exceeded a Listing after determining under Step Two that his impairments were "severe."  When analyzing a claimant's disability pursuant to the Sequential Process, the ALJ only proceeds to the next step if he cannot classify the claimant as disabled or nondisabled.  20 C.F.R. § 404.1520(a)(4).  Step Two of the process only allows an ALJ to find a claimant nondisabled:  "If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."  20 C.F.R. § 404.1520 (a)(4)(ii).

In other words, the purpose of Step Two is to end the analysis if a claimant has no severe impairment, rather than to definitively classify him as disabled.  See Hickman v. Apfel, 187 F.3d 683, 688 (7th Cir. 1999) ("[I]t is quite apparent that severity is merely a threshold requirement, for not all severe cases will (either medically or functionally) meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1."); Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984) ("An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled.")  An ALJ cannot find a claimant disabled until he at least determines that the impairment meets or medically exceeds a listed condition under Step Three.  20 C.F.R. § 404.1520(a)(4)(iii). Thus, the ALJ properly continued to Step Three after finding Mr. Young's impairment "severe."

Second, the ALJ did not commit reversible error when he determined that Mr. Young's condition did not meet or medically exceed a listed medical impairment.  Mr. Young asserts that the medical file on his condition was incomplete because the ALJ did not include a Psychiatric

11

Review Technique Form ("PRTF") and because the Social Security Commissioner never ordered a neuropsychological evaluation despite repeated requests from the Plaintiff and his treating physicians (Pl.'s Br. 11, 14).[3]

Yet, the Seventh Circuit recently explained that the Social Security regulations had been amended to "eliminate the requirement of a standard document." Burke v. Astrue, 306 Fed. App'x 312, 315 (7th Cir. 2009).[4] Instead of completing a PRTF, the ALJ must follow and document the "special technique" outlined in 20 C.F.R. § 416.920a. Id. The special technique stipulates that the ALJ evaluate and document the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [he has] a medically determinable mental impairment." 20 C.F.R. § 416.920(a)(b)(1).[5] If there is an impairment, the ALJ will then "rate the degree of [his] functional limitation based on the extent to which [his] impairment(s) interferes with [his] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920(a)(c)(2).

The ALJ has a duty to present a complete record, but he is under no obligation to compel a consultative psychological examination if no medical evidence in the record supports the claimant's contention that he suffers from a medical impairment. Howell v. Sullivan, 950 F.2d 343, 348 (7th Cir. 1991). Cf. Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008) (ALJ did not commit reversible error by failing to consider "exceedingly sparse" evidence of a mental impairment, particularly since "no physician asserted that any anxiety or depression impaired [the claimant's] ability to work"); Stambaugh v. Sullivan, 929 F.2d 292 (7th Cir. 1991) ("Where,

---

[3] Nowhere in his brief does Mr. Young contest the ALJ's finding that his condition did not meet or medically exceed the Listings for diabetes mellitus, convulsive epilepsy, and nonconvulsive epilepsy. Pl.'s Br. 10-12.
[4] Although Burke was decided after Mr. Young's ALJ hearing, the statute cited in Burke and at issue here was amended prior to 2000 - well before Mr. Young's initial application for Social Security Disability Insurance Benefits. Burke, 306 Fed. App'x at 315.
[5] "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908.

12

as in this case, substantial evidence of [a listed mental impairment] is presented. . . the claimant should have been given a psychological examination.") (internal citation omitted).

Here, the record is devoid of "medical evidence consisting of signs, symptoms, and laboratory findings" that Mr. Young suffers from a mental impairment. 20 C.F.R. § 416.908. The only reference in the record to a possible mental impairment comes from Dr. Reed's opinion that Mr. Young is a "borderline eccentric individual" and a "recluse" with an "anxiety state" (R331). He later noted that Mr. Young has a "personality disturbance" (R329). In neither case, however, did he explain what – if any – signs, symptoms, or laboratory findings he relied on to arrive at that conclusion.[6]

Where there has been objective medical testing, such as the two EEGs and MRI, Mr. Young has not been diagnosed with a medically determinable mental impairment. Both EEGs came back "normal" (R257, 434). The MRI showed an "[a]bnormal hippocampal gyrus on the left likely representing mesial temporal lobe sclerosis" (R435), which could be a "structural disturbance that may be responsible for seizures" (R434). However, Mr. Young has offered no evidence in the record that mesial temporal lobe sclerosis was a cause or contributor to a mental impairment listed under subsection 12.00 of 20 C.F.R. Part 404, Subpart P, App'x 1. Since Mr. Young presented no medically objective evidence that he suffered from a medically determinable mental impairment, the ALJ did not err by failing to order a consultative neuropsychological examination. Without evidence of an impairment, the ALJ did not need to continue to apply the "special technique" that would otherwise be required under 20 C.F.R. § 416.920(a)(c)(2).

Finally, Mr. Young argues that the ALJ committed reversible error at Step Five by making his own medical judgment in place of all of Mr. Young's treating physicians and by

---

[6] Several physicians noted that Mr. Young's excessive caffeine intake contributed to his anxiety. See, e.g., (R265) (Dr. Dong recommends that Mr. Young decrease his caffeine intake since "[e]xcessive use of caffeine may cause agitation, anxiety attacks and shaking episodes.")

relying on Vocational Rule 201.23 instead of vocational testimony. Pl's Br. 12-18. Essentially, the parties dispute whether there is substantial support for the claim that Mr. Young's impairments fully impede his ability to work.

As to the first point, Mr. Young argues that "[n]one of the treating physicians were given controlling weight." Pl.'s Br. 14. In this case, however, the ALJ relied heavily on several physicians' opinions to conclude that Mr. Young was not fully disabled (R53-54). He cited Dr. Krock's finding that Mr. Young's seizures were "questionable" and "never conclusively . . . diagnosed" (R53, citing R384). He also cited Dr. Krock's finding that Mr. Young's "spells" were controlled by the antiepileptic drug Depakote. Id. (citing R384). The ALJ also cited the results of the two EEGs performed on Mr. Young, both of which had come back "normal" and without any conclusive signs of epileptiform abnormalities (R53-54, citing R265, R434).

The ALJ did discount Dr. Reed's opinion that Mr. Young would "[never] be employable" due to his "unpredictable seizures" and his "personality disturbance" (R55, citing R329). An ALJ must not "succumb to the temptation to play doctor" by substituting his own lay opinion for a treating physician's medical opinion. Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990). However, an ALJ may discount a treating physician's opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004) (per curiam) (internal citations omitted); Social Security Ruling ("SSR") 96-2p.

The ALJ's finding that Dr. Reed's opinion was unsupported and inconsistent with other substantial evidence was not clearly erroneous. The ALJ devoted nearly a page to explaining why he believed Dr. Reed's opinion was unpersuasive (R55). He found that Dr. Reed's opinion

conflicted "sharply with the other evidence of the record, particularly that of the neurologist, which renders it less persuasive." Id. Dr. Reed opined that Mr. Young had Jacksonian tremors since he was a child and a history of seizure disorder (R294), whereas Dr. Krock noted that he was unsure whether Mr. Young had a seizure disorder (R370, 384, 392, 415). Drs. Dong and Ergene, both neurologists, found no definitive signs of an epileptiform abnormality after conducting seperate EEG examinations of Mr. Young (R257, 434). Similarly, Dr. Reed opined that Mr. Young would not be employable outside his home (R329, 331), yet State Agency doctors found that he was able to perform light work with some limitations (R311). Even Dr. Reed's own opinions are contradictory: on a form dated November 15, 2005 he noted that he was "not sure that [the seizure disorder] is an accurate description of what is happening" (R342). Several months later, Dr. Reed again expressed "doubt" about whether Mr. Young was really experiencing seizures (R331).

The ALJ also found that Dr. Reed's opinion was not well-supported (R55). First, there is evidence that Dr. Reed's opinions were based largely off of Mr. Young's subjective description of his medical history, rather than objective medical testing. See, e.g., R293 ("He has a history of seizure disorder. I am not sure that is an accurate description of what is happening."); R331 ("He continues to have the occasional mild episode where he feels light [sic] headed and those around him interpret it as a seizure. I doubt if it is a seizure…"). More importantly, he never explained how he reached the conclusion that Mr. Young would never be employable other than providing a cursory reference to an undiagnosed "personality disturbance" (R329, 331). The ALJ was also not required to give controlling weight to Dr. Reed's opinion that Mr. Young "would [never] be employable" due to his impairments, since only the Commissioner has the

15

administrative authority to determine whether a claimant is fully disabled. 20 C.F.R. § 404.1527(e)(1).

The ALJ also noted that there was a possibility that Dr. Reed had "express[ed] an opinion in an effort to assist a patient with whom [he] sympathizes for one reason or another," for example, to "avoid unnecessary doctor/patient tension" (R55). Indeed, the amount of time a doctor and his patient spent together outside the office might evidence a close personal relation, which may properly be taken into account during a credibility determination. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007). In this case, Mr. Young and Dr. Reed had an employer-employee relationship in addition to their doctor-patient relationship (R98, 198). In light of the fact that Dr. Reed's opinion was inconsistent with other opinions and unsupported by medical testing, this Court will not disturb the ALJ's credibility determination.

The ALJ also reasonably relied on the VE's testimony.[7] If a claimant cannot perform substantially all of the exertional demands of a given level of exertion, the ALJ may rely on VE testimony to determine what specific jobs the claimant may perform given his personalized impairment. Haynes v. Barnhart, 416 F.3d 621, 628 (7th Cir. 2005). The VE's testimony should be consistent with the "Dictionary of Occupational Titles" ("DOT"). SSR 00-4p. If it is not, the ALJ must determine whether the VE's testimony is reasonable, and then document the basis for relying on it rather than the DOT. Id. McKinnie v. Barnhardt, 368 F.3d 907, 910-11 (7th Cir. 2004).

Contrary to Mr. Young's assertion, the ALJ did present a hypothetical to the VE during the hearing (R109-110), and found that he had the following RFC:

---

[7] Mr. Young argues that the ALJ improperly relied on Vocational Rule 201.23 instead of VE testimony at Step Five. Pl.'s Br. 15. This appears to be a scrivener's error since the ALJ only referred to Vocational Rule 202.14 (R56). Nevertheless, the ALJ clearly stated that he was not relying on Vocational Rule 202.14 because Mr. Young had impairments that prevented him from performing a full range of light work. Id. In other words, he did rely on VE testimony to determine what jobs were available to Mr. Young given his individual limitations.

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he cannot climb ladders, ropes, or scaffolds; he cannot kneel or crawl; he must avoid concentrated exposure to unprotected hazards such as heights and machinery; he must avoid concentrated exposure to extreme heat and cold; and he needs a sit/stand option. (R51)

Moreover, the limitations in this RFC are substantially supported by the record evidence. Mr. Young's Physical Residual Functional Capacity ("PRFC") examination showed that his possible syncope or seizures prevented him from safely using ladders, rope, scaffolds, or dangerous machinery (R308), which is consistent with Mr. Young's testimony that he felt unsafe performing past work because of the risk of having a sudden seizure (R97).

The PRFC examination also found that he could only occasionally lift 50 pounds, and would need to be able to sit and stand at work (R305). This is consistent with his testimony that lifting 50 pounds while baling hay or moving packages caused him long-term pain (R100). The hypothetical also took into account Mr. Young's testimony that he could not be on his knees for very long due to knee pain (R104). Finally, the hypothetical stipulated that any listed job avoid subjecting Mr. Young to extreme heat or cold, which Mr. Young believed was a trigger for his seizures (R87).

The ALJ also had substantial evidence to discount Mr. Young's statements regarding the intensity, persistence and limiting effects of his impairment on his ability to work that was inconsistent with the aforementioned RFC. The ALJ found that Mr. Young's seizure disorder was possibly not as severe as alleged since he had refused to follow Dr. Ergene's recommendation that he get a follow-up EEG and his prescription for Trileptal (R54, citing R434). The ALJ also considered the fact that both Dr. Krock and Dr. Reed noted on several occasions that Mr. Young's seizures were controlled by medication (R54). See, e.g., (R329) (noting Mr. Young has had "fewer seizures" and "feels better" since beginning to take Phenobarb), (R331) (noting Mr. Young has had fewer seizures since taking Depakote); (R367)

17

("Patient's seizures due to the nature that the patient has been off his medications for 6 months."); (R384) ("His spells seem controlled under the current regimen with the Depakote….").

There was also evidence in the record that Mr. Young had the physical ability to perform types of light work. He testified that he had been feeling better since beginning an isometric exercise regime. See (R99, 101) (Mr. Young's testimony that isometrics helped alleviate pain in his shoulders and knees as well as numbness in his toes and feet). He also prepared meals, did house work and yard work, drove into town for groceries and errands, and composed and played music for church. Id. In fact, certain testimony demonstrated that Mr. Young was more unwilling, rather than unable to work; for example, he testified about not wanting to participate in the "rat race" of typical employment and that a lack of income was most of his problem. Id. In sum, the ALJ's determination that Mr. Young had the RFC to perform light work with some limitations is based on substantial evidence from the record.

There is no reason to disturb the ALJ's reliance on the VE's testimony. The VE provided a list of several jobs that Mr. Young could perform given his age, education, work experience, and the ALJ's hypothetical (R110-11). The VE testified that all of his data were consistent with the DOT, even though they were taken from various government statistical sources, the privately-published "Occupational Employment Quarterly," and the O-NET program. (R112-13). Every job listed by the VE was referenced by a DOT number (R110-11), and the Social Security Administration takes administrative notice of statistics compiled by the US Bureau of the Census and occupational analyses compiled by the states for the SSA. 20 C.F.R. § 404.1566(d).

Additionally, neither the ALJ nor Plaintiff's attorney inquired into the reliability of the VE's testimony during the hearing,[8] and Plaintiff's attorney raised no objections to the VE's qualifications or report during the hearing (R108-09).  If there are no questions raised during the hearing about the "shortcomings in the vocational expert's data or reasoning," the ALJ may properly credit the VE's testimony without conducting further inquiry.  Donahue v. Barnhardt, 279 F.3d 441, 446-47 (7th Cir. 2002).  Therefore, there was a substantial foundation for the ALJ to rely on the VE's testimony that Mr. Young could perform certain jobs in the national and local economy.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Reversal is DENIED, and the Commissioner's Motion to Affirm is GRANTED.  This matter is now TERMINATED.

ENTERED this 23rd day of June, 2010.

                                                          s/Michael M. Mihm
                                                          Michael M. Mihm
                                                          United States District Judge

---

[8] Mr. Young also argues that the ALJ failed to conduct the VE's testimony according to the SSA because the testimony was given over the telephone, rather than in person.  Plaintiff's attorney, however, had the ability to cross-examine the witness (R111-14).  Further, the regulations explicitly allow testimony to be "provided by telephone." 20 C.F.R. § 403.110(h)(1).